UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MOTOROLA CREDIT CORPORATION and     :
NOKIA CORPORATION,                  :
                                    :
              Plaintiffs,           :        02 Civ. 666 (JSR)
                                    :
      v.                            :        OPINION UNDER SEAL
                                    :
KEMAL UZAN, et al.,                 :
                                    :
              Defendants.           :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

     On July 31, 2003, this Court awarded plaintiff Motorola Credit
Corporation ("Motorola") damages in the amount of $2,132,896,906
against defendants Kemal Uzan, Murat Hakan Uzan, Cem Cengiz Uzan,
Melahat Uzan, Aysegul Akay, and Antonio Luna Betancourt (the
"Uzans"), based on the Uzans' diversion of large loans made by
plaintiffs to Telsim, a Turkish telecommunications company owned in
large part by the Uzans.[1]  Since that time, the Uzans – most of
whom are fugitives from criminal indictments in Turkey brought as a
result of a separate fraud – have failed to participate in this
action or pay the judgment against them, and Motorola has engaged
in a worldwide, decade-long hunt for the Uzans and their assets.

     In response to Motorola's efforts to track down those
concealed assets, on February 13, 2013, the Court issued an Order

---

[1] In June 2006, Motorola obtained an additional judgment for $1
billion in punitive damages. See Order, No. 02 Civ. 666, ECF No.
675 (S.D.N.Y. June 15, 2006).

1

pursuant to Rules 65 and 69 of the Federal Rules of Civil Procedure and N.Y. C.P.L.R. § 5222[2] that: (1) enjoins the Uzans, their agents, and anyone receiving notice of the Order from transferring or dissipating any Uzan assets until Motorola's judgment is paid in full; and (2) requires any subpoenaed party in possession of property of the Uzans or their agents to immediately freeze and restrain access to such property. See Order Granting Injunctive Relief and Restraining Order ("Injunction and Restraining Order"), No. 02 Civ. 666 (S.D.N.Y. Feb. 13, 2013). Attached to the Court's Order is a list of "Uzan Proxies," defined as "entities or persons that serve as agents or instrumentalities of or are otherwise controlled, directly or indirectly, by the Uzans." Id. ¶ 10 & Attach. A. As relevant to the instant dispute, the Jordan Dubai Islamic Bank ("JDIB"), an international commercial bank, is identified in Attachment A as an Uzan proxy.[3]

---

[2] Rule 69(a)(1) of the Federal Rules of Civil Procedure provides that "[t]he procedure on execution -- and in proceedings supplementary to and in aid of judgment or execution -- must accord with the procedure of the state where the court is located . . . ." Thus, the Court must look to post-judgment remedies available, and the limitations to those remedies, under New York law.

[3] As part of its response to the instant motion, Motorola submitted under seal and in camera an extensive declaration reiterating (in greater detail than the Court previously received) its factual basis for believing that the Uzans exercise such control over JDIB that JDIB occupies an agency or agency-like relationship with respect to the Uzans. Moreover, the Court notes that the notion that the Uzans would seek to exercise control over an otherwise legitimate bank is consistent with the Uzans' history: in the early

On February 14, 2013, Motorola served the Injunction and
Restraining Order on the New York branch of Standard Chartered
Bank, an international banking group headquartered in the United
Kingdom, which has locations, as relevant here, in Jordan and the
United Arab Emirates ("UAE"). After conducting a search in New York
and globally for assets belonging to the Uzans or their identified
proxies, Standard Chartered identified what it claimed were four
interbank deposits placed by JDIB at a Standard Chartered branch in
the UAE: three recent placements each in the amount of five million
Jordanian Dinar, and a fourth in the amount of six million
Jordanian Dinar, for a total of 21 million Jordanian Dinar ($30
million).[4] Decl. of Julian Slow dated May 10, 2013 ("Slow Decl.")
¶¶ 10, 15. Interbank deposits are short-term transfers of funds
from a bank with excess liquidity to a bank facing excess
liabilities, which are then repaid at an agreed-upon future date,
with interest. Id. ¶¶ 3-4.

After seeking from Motorola clarification regarding the scope
of the Injunction and Restraining Order, Standard Chartered froze

---

2000s, the Uzans embezzled billions of dollars from two Turkish
banks which led to the criminal indictments mentioned above. After
undertaking a review of these facts, the Court is satisfied that
JDIB was properly named as an Uzan proxy in the Court's Injunction
and Restraining Order.

[4] On May 20, 2013 Standard Chartered obtained authorization from
JDIB to disclose the amounts of the transfers, as Standard
Chartered represents is required under UAE law.

JDIB's assets on April 26, 2013. On May 8 and 9, 2013, two payments were due to JDIB, but Standard Chartered refused to remit payment. See Decl. of Rakan Shiyab dated May 12, 2013 ("Shiyab Decl.") ¶ 5; Slow Decl. ¶ 15. Since that time, two other payments came due, and Standard Chartered again refused to remit payment. See Decl. of Jeremy Julian Ronald Trevis dated May 30, 2013 ("Trevis Decl.") ¶ 4. After Standard Chartered refused to process JDIB's payments, the UAE Central Bank debited from Standard Chartered's account with the Central Bank funds in the full amount of JDIB's assets. See id. ¶¶ 6, 10.

On May 14, 2013, Standard Chartered filed a motion for relief from the Court's Injunction and Restraining Order, and the Court heard oral argument on Standard Chartered's motion on May 24, 2013. On May 30, 2013, the Court issued a "bottom-line" Order, concluding that (i) the assets in question are property of the Uzans or their proxies and not of Standard Chartered, and (ii) New York's "separate entity rule" nevertheless precludes Motorola from restraining assets held by a foreign Standard Chartered branch by service of the Injunction and Restraining Order on Standard Chartered's New York branch. Additionally, because of the risk that Motorola would be irreparably harmed by the release of JDIB's assets, the Court imposed a stay on the release of the restraint on the assets pending an appeal by Motorola and upon Motorola posting

4

a $1 million bond. This Opinion explains the reasons for those rulings.

As an initial matter, Motorola claims that, by failing to object to the Injunction and Restraining Order within fourteen days after receiving it on February 15, 2013, <u>see</u> Injunction and Restraining Order at 5, Standard Chartered waived any and all objections to compliance with the Order. However, even though Standard Chartered did not formally make its motion to modify the Injunction and Restraining Order until May 14, 2013, it is clear that in the meantime Standard Chartered was attempting to cooperate with Motorola's requests in good faith. Thus, for example, in April 2013, Standard Chartered identified and provided to Motorola a substantial number of documents unrelated to the assets at issue here. <u>See</u> Decl. of George R. Calhoun, V dated May 22, 2013 ("Calhoun Decl.") ¶ 7. Moreover, even though Standard Chartered disputed whether the Court's Order required freezing of JDIB's assets in the UAE, Standard Chartered nonetheless froze the assets to avoid harm to Motorola and only then pressed its objections before the Court. Under these circumstances, it would be inequitable to find that Standard Chartered had waived the objections it has presented here.

Turning to the substantive issues in this case, the first issue that the Court must address is whether the assets in question

are property of the Uzans or their proxies and not Standard Chartered. Fundamentally, the parties dispute the nature of the JDIB assets held by Standard Chartered. While Standard Chartered claims, as described above, that the assets are four interbank placements made by JDIB, Motorola claims that, based on a "Master Agreement" entered into between JDIB and Standard Chartered, the JDIB assets are in fact four palladium commodities trades undertaken between Standard Chartered and JDIB for the same total value as the interbank transfers that Standard Chartered claims occurred. See Calhoun Decl. ¶¶ 12-14 & Exs. 7-9. Standard Chartered acknowledges that palladium trades in fact occurred, but it claims that those trades were merely mechanisms to allow its interbank transfers to comply with the prohibition on the payment of interest under Islamic law. See Decl. of Hassan Arab ¶¶ 1-10. That is, Standard Chartered claims that the palladium trades are virtually instantaneous transactions that allow the repayment of the transfers by Standard Chartered to JDIB to be accompanied by a profit on the palladium trade, rather than interest.

It is axiomatic, however, that Standard Chartered is bound by the unambiguous terms of the contracts into which it enters. Given the terms of the contracts here in question, Standard Chartered is effectively estopped from denying that the assets at issue are palladium or the proceeds of trades thereof. In that context, such

assets are the property of JDIB merely held by Standard Chartered and may properly be restrained under the Court's Injunction and Restraining Order. See Injunction and Restraining Order at 3 (including as Uzan property to be restrained "any assets, funds, property or debt held in the name of or owed to" the Uzans or their proxies).

Moreover, even if the Court were to accept Standard Chartered's representation that the frozen assets are effectively interbank placements that merely give JDIB the right to demand that Standard Chartered repay funds at some point in the future, this would not distinguish the transfers from run-of-the-mill bank accounts or other debts that may be restrained as a matter of course under N.Y. C.P.L.R. § 5222(b). See N.Y. C.P.L.R. § 5222(b) (providing for restraining orders to be served on garnishees owing a "debt to the judgment debtor"); Injunction and Restraining Order at 4 (providing that the order covers "all debts hereafter coming due to the Uzans or the Uzan Proxies"); see also Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 21 (1995) (noting that bank deposits "consist[] of nothing more or less than a promise to pay, from the bank to the depositor"). Thus, in either circumstance, the Court finds that the restrained assets are the property of JDIB, an Uzan proxy, not Standard Chartered.

To be sure, Standard Chartered requests that, even if the assets are JDIB's property, the Court should equitably modify the restraint to allow the release of the JDIB assets based on the risk that Standard Chartered could be subject to double liability should the restraint be maintained. See N.Y. C.P.L.R. § 5240 (allowing a court to "make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure"). In the ordinary course of domestic banking, N.Y. C.P.L.R. § 5209 discharges a garnishee bank from any "obligation to the judgment debtor to the extent of the payment or delivery" to a judgment creditor. However, Standard Chartered raises the concern that its UAE branch is "beyond the protection of the Full Faith and Credit Clause," and so N.Y. C.P.L.R. § 5209 can offer no protection. JPMorgan Chase Bank, N.A. v. Motorola, Inc., 47 A.D.3d 293, 307, (N.Y. App. Div. 2007). Standard Chartered further asserts that the UAE will not recognize the binding force of this Court's Injunction and Restraining Order without registration in UAE courts pursuant to local law, and therefore, should Motorola seek a turnover in the amount of JDIB's interbank placements, Standard Chartered could face the risk of double liability: it would have to pay the amounts frozen to Motorola, but, under local UAE law, it would not be released from its obligation to remit funds to JDIB. See Decl. of Hassan Arab dated May 23, 2013.

The Court is not at all persuaded that these dire predictions will eventuate. But even assuming the possibility that these events would come to pass, under New York law it is well established that banks assume the risk of double liability as an ordinary cost of doing business in multiple jurisdictions. See Petrogradsky Mejdunarodny Kommerchesky Bank v. Nat'l City Bank of N.Y., 170 N.E. 479, 485 (1930) ("Whatever risk it runs abroad, is one that it assumed as part of the business of a bank. The chance of double payment is a common risk of life."); JPMorgan Chase Bank, N.A. v. Motorola, Inc., 846 N.Y.S.2d 171, 184 (App. Div. 2007) ("As the Court of Appeals suggested in Petrogradsky, the risk of double liability arising from such a dispute is 'assumed as part of the business of a bank' and, we might add, that risk is a foreseeable one that banks presumably consider in setting the fees charged to account-holders."). Thus, this concern does not provide a sufficient basis for equitable modification of the Court's Order. Nor does Standard Chartered's contention that being subject to double liability would violate the Due Process Clause have merit, as there is no state action to which such constitutional concerns could attach. Cf. W. U. Tel. Co. v. Pennsylvania, 368 U.S. 71, 75 (1961) (finding, in the context of claims by both Pennsylvania and New York to the same property, that double liability would violate due process). Accordingly, the Court denies Standard Chartered's

request for an equitable modification of the reach of the Court's prior Order.

Turning to Standard Chartered's second objection to the enforcement of the restraint, in the ordinary case "a New York court with personal jurisdiction over a [garnishee] may order him to turn over out-of-state property" of a judgment debtor in a post-judgment enforcement action. Koehler v. Bank of Bermuda, Ltd., 12 N.Y.3d 533, 541 (2009). Here, Standard Chartered does not contest that, as a general matter, this Court may exercise personal jurisdiction over it, as its operation of a branch in New York establishes its presence in New York. Thus, the Court ordinarily could order Standard Chartered to freeze JDIB's assets in the UAE under N.Y. C.P.L.R. § 5222. See Order at 4.

However, Standard Chartered invokes as an exception to this general rule New York's "separate entity rule," under which, "for purposes of attachment, among others," courts must treat "each branch of a bank [as] a separate entity, in no way concerned with accounts maintained by depositors in other branches or at the home office." Cronan v. Schilling, 100 N.Y.S.2d 474, 476 (Sup. Ct. 1950), aff'd, 126 N.Y.S.2d 192 (App. Div. 1953). Here, Motorola served restraining notices and the Court's Order on Standard Chartered's New York branch only. Standard Chartered argues that this is insufficient: under the separate entity rule, Motorola is

required to serve such notices on the specific bank branch where the accounts or assets to be restrained are located, not the New York affiliates of such foreign entities. Therefore, Standard Chartered argues, Motorola's service of the restraining notice is ineffective as to JDIB's assets held at Standard Chartered's UAE location, even though, by its terms, the Injunction and Restraining Order "covers all Uzan Property in the possession or custody of any person or entity, and all debts hereafter coming due to the Uzans or the Uzan Proxies, whether such property or debt is located <u>in the State of New York or elsewhere</u>." Injunction and Restraining Order at 4 (emphasis added); <u>see</u> <u>Shaheen Sports, Inc. v. Asia Ins. Co., Ltd.</u>, No. 98-CV-5951, 2012 WL 919664, at *3 (S.D.N.Y. Mar. 14, 2012) ("It has also long been considered settled law in New York, however, that where that garnishee is a bank, the court must obtain jurisdiction over the specific bank branch holding the asset before it may order any turnover, notwithstanding its general jurisdiction over the banking entity by virtue of its New York branch.").

In response, Motorola first urges this Court to find that the separate entity rule no longer applies to post-judgment enforcement actions in the wake of the New York Court of Appeals decision in <u>Koehler v. Bank of Bermuda, Ltd.</u>, 12 N.Y.3d 533 (2009). In that case, the New York Court of Appeals -- applying the principle that, for purposes of post-judgment attachment, a New York court need

11

only personal jurisdiction over the garnishee -- required the Bank of Bermuda Ltd., which held stocks in Bermuda belonging to a judgment debtor, to turn over the stock certificates to the judgment creditor in that case. Id. at 536. Motorola asks this Court to infer from this determination that the Court of Appeals, sub silentio, overruled the separate entity rule in the context of post-judgment attachment, as it merely required personal jurisdiction, not service on the Bermuda bank branch where the asset was located. See id. at 538. Thus, Motorola argues, even though Koehler did not explicitly overturn – or even discuss – the separate entity rule, its logic implies that the separate entity rule does not apply in the context of post-judgment enforcement proceedings under N.Y. C.P.L.R. Article 52.

Confronted with this or similar arguments, various state and federal courts have taken up the question of whether the separate entity rule continues to apply to post-judgment enforcement, only to reach differing conclusions. Compare, e.g., JW Oilfield Equip., LLC v. Commerzbank, AG, 764 F. Supp. 2d 587, 595 (S.D.N.Y. 2011) ("Koehler indicates that New York courts will not apply the separate entity rule in post-judgment execution proceedings."), with, e.g., Shaheen Sports, Inc. v. Asia Ins. Co., Ltd., No. 98-CV-5951, 2012 WL 919664, at *5 (S.D.N.Y. Mar. 14, 2012) (finding that the separate entity rule continues to apply after Koehler).

The Court finds itself in agreement with those cases finding that the separate entity rule continues to bear weight. To begin with, it appears that in Koehler, the Bank of Bermuda's Bermuda branch "itself had ultimately consented to the personal jurisdiction of the district court and therefore 'the separate entity rule [had] no role to play in this case, [because] [h]ere, the foreign branch itself was properly served.'"[5] Shaheen Sports, 2012 WL 919664, at *4 (brackets in original) (quoting Koehler v. Bank of Bermuda Ltd., No. M18-302, 2005 WL 551115, at *12 (S.D.N.Y. Mar.9, 2005)). Additionally, as Chief Judge Preska also recognized in Shaheen Sports, the separate entity rule has a long history and embodies important policy interests of the State of New York, and therefore "it is not unreasonable to expect that if the New York Court of Appeals had chosen to eliminate it, it would have said so." 2012 WL 919664, at *5; see also Samsun Logix Corp. v. Bank of China, 31 Misc. 3d 1226(A), 929 N.Y.S.2d 202 (Sup. Ct. 2011) ("[T]he Court of Appeals in Koehler did not even mention the

---

[5] Motorola posited at oral argument that the reason that Koehler did not address the separate entity rule is because the New York Court of Appeals had never applied the separate entity rule in the context of post-judgment enforcement. However, it is clear that the common understanding of the lower courts in the intervening decades since the adoption of the separate entity rule is that the separate entity rule applies in this context. See, e.g., JW Oilfield Equip., 764 F. Supp. 2d 587; Samsun Logix Corp., 929 N.Y.S.2d 202. Moreover, it appears more plausible that, as discussed above, Koehler did not address the separate entity rule because the Bermuda branch of the Bank of Bermuda itself consented to jurisdiction, rendering the separate entity rule irrelevant.

13

separate entity rule, thereby strongly indicating that it had not
intended to overrule that doctrine ."). In sum, from a combination
of the fact that Koehler had no reason to address the separate
entity rule and that it is unlikely that the New York Court of
Appeals would silently overrule such an important policy and
precedent, this Court concludes that the Court of Appeals intended
no such thing. See Det Bergenske Dampskibsselskab v. Sabre Shipping
Corp., 341 F.2d 50, 53 (2d Cir. 1965) (stating that a federal court
"may not alter an established rule of New York law when there has
been no indication by the New York lawmakers that they have changed
their point of view").

Motorola also argues that the recent New York Court of Appeals
decision in Commonwealth of the Northern Mariana Islands v. Can.
Imperial Bank of Commerce, 21 N.Y.3d 55, at *2 (2013), stands for
the principle that courts should look to the language of Article 52
itself, "giving effect to the plain meaning thereof" without
inserting unwritten terms. Motorola points to the fact that the New
York State legislature has codified treatment of banking branches
as "separate entities" in other statutes, see, e.g., N.Y. U.C.C. §
4(a)-105(b) ("A branch or separate office of a bank is a separate
bank for purposes of this article."), to suggest that the
legislature never intended such an exclusion to apply to N.Y.
C.P.L.R. § 5222(b). However, given the over fifty-year lifespan of

14

the separate entity rule, it is equally reasonable to assume that the legislature has intentionally acquiesced in – and indeed expanded upon – the separate entity rule's application in the enforcement context.

Motorola next contends that, even apart from <u>Koehler</u>, the separate entity rule no longer makes sense as a matter of logic in the face of modern technology allowing greater coordination among the various branches of a given bank. Motorola claims that the separate entity rule was motivated at the time of its creation by the fact that banks faced a risk of inconsistent obligations because they had no capacity to communicate quickly regarding attachments issued at other branches. As explained in <u>Cronan</u>, in the absence of the separate entity rule, "no branch could safely pay a check drawn by its depositor without checking with all other branches and the main office to make sure that no warrant of attachment had been served upon any of them," and such a state of affairs "would place an intolerable burden upon banking and commerce." 100 N.Y.S.2d at 476. Motorola argues that, today, with ever-improving technology facilitating nearly instant global communications, the policy rationale supporting the separate entity rule has now been sufficiently undermined such that the rule's legal fiction is no longer necessary. See <u>Digitrex, Inc. v. Johnson</u>, 491 F. Supp. 66, 69 (S.D.N.Y. 1980) (calling the rule

"obsolete" in an era of centralized computer databases). That is, according to Motorola, there is no longer any reason that banks should be treated any differently from other multi-national entities holding the property of a judgment debtor.

However, as this Court has already recognized in an earlier decision in this very action, the separate entity rule not only reflects a consideration of accessibility, but also is intended to "avoid[] undue disruption of routine banking practices," which, even with the advent of global telecommunications technology, "may still carry weight when the requested transfers involve banks subject to foreign laws and practices." Motorola Credit Corp. v. Uzan, 288 F. Supp. 2d 558, 561 (S.D.N.Y. 2003). Moreover, not only is such disruption a concern, but a bank that freezes and turns over to a judgment creditor a judgment debtor's assets held at a foreign branch could "potentially violate local laws," and thus be subject "to double liability" – to both debtor and creditor – if foreign law were to not recognize the validity of the action. Samsun Logix Corp., 929 N.Y.S.2d 202, at *5.

These policy concerns are at the fore in the instant action. Standard Chartered has asserted that restraining the repayment of JDIB's interbank transfers has placed it at serious risk of legal and regulatory consequences in the UAE.  As mentioned above, Standard Chartered claims that the restraint is contrary to UAE

16

law, as UAE courts do not recognize the enforceability of
international court orders unless the party seeking enforcement
registers the Restraining Order in the UAE and/or obtains an order
of preliminary attachment in the UAE. See Shiyab Decl. ¶¶ 6-8.
Unless Motorola takes such action in the UAE, Standard Chartered
asserts that it may be required by local courts or the UAE Central
Bank to repay to JDIB the interbank placements (thereby subjecting
it to double liability), or Standard Chartered may be subjected to
public or private censure by the UAE Central Bank, to include fines
and/or suspension or cancellation of its license to operate there.
See Shayib Decl. ¶ 6.

     It is also apparent that this action has already disrupted
Standard Chartered's operations in the UAE and Jordan. After
Standard Chartered froze JDIB's assets, the Jordan Central Bank
seized documents from the office of Standard Chartered's local CEO;
JDIB's CEO threatened to take legal action, see Supplemental Decl.
of Rakan Shiyab dated May 13, 2013, Ex. B; and the UAE Central Bank
debited from Standard Chartered's account the amounts owed to JDIB,
see Trevis Decl. ¶¶ 6, 10. From the facts of this case alone, it is
clear that the policies implicated by abolition of the separate
entity rule run much deeper than the ability to communicate across
branches. In the absence of more explicit guidance from the New

York Court of Appeals or the legislature, it is not this Court's role to make these sorts of policy determinations.

Finally, Motorola argues that the Injunction and Restraining Order also provides for an injunction pursuant to Federal Rule of Civil Procedure 65 and that the separate entity rule, as a creature of New York state law, does not restrict the Court's inherent equitable powers to enjoin Standard Chartered from transferring JDIB's assets. Issued pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Injunction and Restraining Order forbids the Uzans, their agents, and "any other persons or entity in active concert or participation with the Uzans, or any person or entity with notice of this order" from "making or suffering any sale, assignment or transfer of, or interference with, any Uzan Property, to any person other than" Motorola or "otherwise assisting the Uzans in violating this Order in any way." Order at 3-4. Motorola argues that because Standard Chartered clearly has notice of the Injunction and Restraining Order, it is bound to freeze JDIB's property without regard to the separate entity rule; should Standard Chartered do otherwise, Motorola claims that it would be acting "in active concert or participation with" the Uzans in violation of the injunction.

However, given Rule 69's instruction that the procedures to be utilized by federal courts to execute upon a judgment "must accord

with the procedure of the state where the court is located," Fed.
R. Civ. P. 69(a)(1), the Court is skeptical that its injunction
allows Motorola to skirt limitations on such relief under New York
law through the use of a broad federal procedural mechanism. Unlike
the injunction – which is directed at the Uzans, their agents, and
those acting "in active concert or participation" with them – the
portion of the Court's order that proceeds under N.Y. C.P.L.R. §
5222 is directed to "any person or entity that is in possession or
custody of any Uzan Property," without reference to any
relationship to or action taken in conjunction with the Uzans or
their proxies. Order at 3-4. Standard Chartered's relationship to
this action fits within this latter category, and it would unduly
stretch the language of the Court's Order to find that continuing
to engage in routine banking transactions can be turned into
"active concert or participation with the Uzans" simply through
"notice of [the Court's] order." Moreover, reading the Rule 65
injunction to apply in the circumstances here would make the two
halves of the Order entirely duplicative, with the exception of the
applicability of New York's separate entity rule. Thus, the better
reading is that only the Court's restraining order pursuant to N.Y.
C.P.L.R. § 5222 is implicated by this action, and therefore the
Court need not reach the question of whether the separate entity
rule applies to injunctions issued under Rule 65.

For the foregoing reasons, the Court in its Order of May 30, 2013, found that the separate entity rule precludes Motorola from restraining JDIB's assets located at Standard Chartered's UAE branch. However, a few words are in order regarding the Court's decision to keep in place the asset freeze pending this opinion and any appeal of the Court's determination.

In an exercise of the Court's equitable powers, the Court decided that a temporary injunction against the release of the JDIB assets would be appropriate in this case. In order to obtain such an injunction, a court must find that there would be "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010) (quotation marks omitted).

The Court finds it highly likely that Motorola would suffer irreparable harm if the freeze on JDIB's assets were removed pending appeal. At this point, JDIB is aware that Standard Chartered has frozen its assets and that the Court has determined that JDIB is an Uzan proxy. Given the Uzans' history of secreting assets away from Motorola's efforts to collect on its judgment, it

is doubtless the case that, should the freeze be released, no assets would remain for Motorola to restrain or execute upon.

Moreover, because, as discussed above, the issue of whether the separate entity rule applies remains an open and hotly-contested issue in the wake of Koehler, it is clear that question of the rule's applicability here is a "sufficiently serious question[] going to the merits" of the instant dispute. Finally, although Standard Chartered faces some risk of hardship by being required to continue to restrain these funds during the period in which the appeal remains pending, Standard Chartered makes no claim that such a restraint will meaningfully hinder its banking operations. Thus, the risk to Standard Chartered is significantly outweighed by the hardship that would be suffered by Motorola, for which the $30 million it may recover from JDIB would be a substantial recovery after a decade of attempting to collect on its judgment.

Accordingly, under either prong of the preliminary injunction test, Motorola is entitled to an injunction against the release of the freeze on JDIB's assets held at Standard Charted Bank. Thus, the Court ordered that the restraint remain in place and ordered Motorola to post a $1 million injunction bond.

For the foregoing reasons, the Court in its May 30 Order determined that (i) the assets in question are property of the

Uzans or their proxies and not Standard Chartered, (ii) New York's "separate entity rule" nevertheless precludes Motorola from restraining those assets because they are held at a Standard Chartered branch in the UAE, which was not served in this action, and (iii) Motorola was entitled to a stay of the release of the restraint on JDIB's assets pending any appeal upon Motorola posting a $1 million bond. To the extent that the parties, or any of them, seek to release to any affected third parties this otherwise sealed Order, the parties should jointly call Chambers to make such application.

    SO ORDERED.

Dated:    New York, New York
        August __, 2013

                                JED S. RAKOFF, U.S.D.J.