

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MOTOROLA CREDIT CORPORATION and
NOKIA CORPORATION,

               Plaintiffs,      :     02 Civ. 666 (JSR)

v.                               OPINION AND ORDER
                                     REDACTED
KEMAL UZAN, et al.,           [UNREDACTED UNDER SEAL]

               Defendants.
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    On July 31, 2003, this Court awarded plaintiff Motorola Credit Corporation damages in the amount of $2,132,896,906 against defendants Kemal Uzan, Murat Hakan Uzan, Cem Cengiz Uzan, Melahat Uzan, Aysegul Akay, and Antonio Luna Betancourt (the "Uzans"), based on the Uzans' diversion of large loans made by plaintiffs to Telsim, a Turkish telecommunications company owned in large part by the Uzans.[1] Since that time, the Uzans — most of whom are fugitives from criminal indictments in Turkey brought as a result of a separate fraud — have failed to participate in this action or pay the judgment against them, and Motorola has engaged in a worldwide, decade-long hunt for the Uzans and their assets.

---

[1] In June 2006, plaintiff obtained an additional judgment of $1 billion in punitive damages. See Order, No. 02 Civ. 666, ECF No. 675 (S.D.N.Y. June 15, 2006).

In the past year, this Court has issued several orders relevant to the instant motion. In November 2012, the Court permitted Motorola to serve ex parte discovery requests on third parties in order to gather information about "Defendants' and/or their agents' assets or whereabouts." Order Regarding Service of Ex Parte Discovery Requests, No. 02 Civ. 666 (S.D.N.Y. Nov. 19, 2012). On February 13, 2013, the Court issued an injunction and restraining order, which (1) enjoined the Uzans, their agents, and anyone receiving notice of the Order from transferring or dissipating any Uzan assets until Motorola's judgment is paid in full; and (2) required any subpoenaed party in possession of property of the Uzans or their agents to immediately freeze and restrain access to such property. See Order Granting Injunctive Relief and Restraining Order ("Injunction and Restraining Order"), No. 02 Civ. 666 (S.D.N.Y. Feb. 13, 2013). Attached to the Injunction and Restraining Order was a list of "Uzan Proxies," defined as "entities or persons that serve as agents or instrumentalities of or are otherwise controlled, directly or indirectly, by the Uzans." Id. ¶ 10. This list included [ENTITIES AND PERSONS] shown by Motorola to have an agency or agency-like relationship to the Uzans. See id. Attach. A.

On February 14, 2013, Motorola served the Injunction and Restraining Order, along with document subpoenas permitted by the November 2012 ex parte discovery order, on the New York branch of [BANK-1] and on [BANK-2].[2] The subpoenas defined [BANK-1] to include "its parent, affiliates, subsidiaries, and its, and their, branches, whether located in New York, elsewhere in the United States, or outside the United States," and requested documents relating to the Uzans, Uzan Proxies, Uzan property, as defined in the Injunction and Restraining Order.

On March 14, 2013, [BANK-1] served on Motorola its responses and objections to the subpoenas. On April 18, 2013, Motorola submitted to the Court a motion seeking to enforce the Injunction and Restraining Order and to compel [BANK-1]'s compliance with the subpoena requests. After receiving written submissions, the Court heard oral argument on Motorola's motion on May 8, 2013, and issued its ruling on June 6, 2013. See Memorandum Order ("Discovery Order"), No. 02 Civ. 666 (S.D.N.Y. June 6, 2013).

---

[2] Motorola also served subpoenas on [BANK-3] and [BANK-4]. [BANK-1] represented that [BANK-3] is not a separate legal entity, and the subpoena directed to [BANK-4] is duplicative of the subpoena directed to [BANK-1] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Based on these representations, the Court treated these subpoenas as subsumed within the subpoena served on [BANK-1].

In granting Motorola's motion to compel compliance with the subpoenas, the Discovery Order rejected several arguments advanced by [BANK-1]:

First, [BANK-1] argued that, because of New York's "separate entity rule," see Cronan v. Schilling, 100 N.Y.S.2d 474, 476 (Sup. Ct. 1950), aff'd, 126 N.Y.S.2d 192 (App. Div. 1953), it need only search its New York branch where the subpoena was served.[3] The Court rejected this argument as far as a search for documents was concerned, requiring [BANK-1] to "conduct[] the full scope of searches requested in Motorola's subpoena." As to assets, however, the Court instructed that if any were found in "a foreign branch," the parties "may then return to this Court for a determination as to whether the separate entity rule applies to bar a restraint on such assets in absence of service on the local branch where the asset or account is held." Discovery Order at 7-8.

Second, the Court was not persuaded by [BANK-1]'s claim that it had satisfied its burden by searching all records to which only

---

[3] Rule 69(a)(1) of the Federal Rules of Civil Procedure provides that "[t]he procedure on execution — and in proceedings supplementary to and in aid of judgment or execution — must accord with the procedure of the state where the court is located . . . ." Thus, the Court's Injunction and Restraining Order was issued pursuant to Fed. R. Civ. P. 69 and N.Y. C.P.L.R. § 5222, and New York law limiting the remedies available in post-judgment proceedings applies.

4

its New York branch had access in the regular course of business. Accordingly, the Court ordered "[BANK-1], including its worldwide banking operations, to conduct the searches specified by the subpoenas of all documents which it has the legal right or authority to obtain upon demand or the practical ability to search." Id. at 10. In response to [BANK-1]'s concern that [FOREIGN] or other foreign law might be implicated by subsequent production, the Court directed that in the event responsive documents implicating foreign-law concerns were found, "the parties should return to this Court to determine how best to proceed before disclosing that information to Motorola." Id. at 11.

On [DATE], Motorola filed a motion to order [BANK-1] to show cause why it should not be held in contempt for failure to respond to the subpoena and Discovery Order. At first, [BANK-1] represented that it had conducted a search of its international branch network, but that even to reveal whether responsive documents were found would risk violation of [FOREIGN] law. Upon learning, however, that other [FOREIGN] banks had revealed as much, [BANK-1] then stated in a [DATE] oral argument that its search of its worldwide branches had revealed no responsive documents or assets. Critically, however, [BANK-1] conceded that it did not search or attempt to

5

search the records of many of its subsidiaries,[4] including the private banks it owns and manages through [BANK SUBSIDIARY].

The question of whether [BANK-1] must search its subsidiaries including [BANK SUBSIDIARY] to comply with the subpoena is now before the Court, which conducted an evidentiary hearing on [DATE], received extensive briefing from both sides, and heard further oral argument on [DATE]. Conceding that documents held by [BANK-1]'s subsidiaries are not within the parent's "possession" or "custody," Motorola urges the Court to find that the subsidiaries' documents are nevertheless within [BANK-1]'s "control" and therefore discoverable pursuant to Federal Rule of Civil Procedure 45 and N.Y. C.P.L.R. § 5224. For the reasons that follow, the Court agrees with Motorola that the [BANK SUBSIDIARY] entities' documents are within the "control" of [BANK-1], and therefore orders [BANK-1] to have them searched in compliance with the subpoenas.

The case law governing the application of subpoenas served on a parent corporation to its subsidiaries turns on a pragmatic understanding of "control." First, "control" encompasses a relationship to the documents beyond mere "possession" or "custody," as evidenced by the inclusion of "control" in § 5224,

---

[4] [BANK] did search some subsidiaries, including a ▮▮▮▮▮ subsidiary located in New York, the records of which were directly searchable by its New York or [FOREIGN] offices.

concerning discovery, whereas § 5225, concerning turnover of assets, covers only those assets in "possession or custody." Compare N.Y. C.P.L.R § 5224 with id. § 5225(b). Upon certification from the Second Circuit Court of Appeals, the New York Court of Appeals described "control" expansively in Commonwealth of the N. Mariana Is. v Canadian Imperial Bank of Commerce, 21 N.Y.3d 55, 62 (2013) ("[V]arious courts have interpreted 'possession, custody, or control' to allow for discovery from parties that had practical ability to request from, or influence, another party with the desired discovery documents. As such, courts have interpreted 'possession, custody, or control' to mean constructive possession.") See also Bank of New York v Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135, 146 (S.D.N.Y. 1997) (" '[C]ontrol' does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action."); In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 530 (S.D.N.Y. 1996).

This pragmatic approach to understanding "control" will often result in a finding that a parent corporation has, practically speaking, sufficient control over its subsidiaries to require that

it search them in compliance with a subpoena served on the parent. See, e.g., Discover Fin. Servs., Inc. v. Visa U.S.A., Inc., 2006 WL 1699566, at *1 (S.D.N.Y. June 20, 2006) (concerning non-party discovery under Fed. R. Civ. P. 45, "[n]umerous courts have concluded that a parent corporation has a sufficient degree of ownership and control over a wholly[]owned subsidiary that it must be deemed to have control over documents located with this subsidiary") (citing Dietrich v. Bauer, 2000 WL 1171132, at *4 (S.D.N.Y. Aug. 16, 2000); Gucci Am., Inc. v. Curveal Fashion, 2010 WL 808639, at *7 (S.D.N.Y. Mar. 8, 2010) ("[A] parent company doing business in New York is required to produce documents held by its subsidiary, even if located overseas.").

This outcome follows even where a parent corporation may not "legally compel" the subsidiary to produce the document, but where there is evidence, "which strongly suggests that, as a practical matter, [the parent] can secure the documents from [the subsidiary]." In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 2006 WL 1328259, at *7 (S.D.N.Y. May 16, 2006). The evidence credited by the Ski Train court that informed its practical finding of "control" for discovery purposes included overlapping management between the parent and subsidiary, and the fact that the parent had "established basic principles for coordination of the activities of

8

its subsidiaries," including "a clear vision of a . . . global business, requiring cooperation and coordination among its many parts." Id. Similarly, in a banking context, "control" for discovery purposes has been found where the parent "exercises operational control and oversight over the activities of its" subsidiary, has established company-wide policies applicable to the subsidiary, and has management overlap. Dietrich, 2000 WL 1171132 at *4.

All the above cuts in favor of Motorola's instant motion. While, in opposition, [BANK-1] cites to three cases, the first two are decidedly inapposite because they concern a subsidiary served with a subpoena asked to obtain documents from its parent company, the opposite of the instant circumstance. See Zenith Electronics LLC v. Vizio, Inc., 2009 WL 3094889 (S.D.N.Y. Sept. 25, 2009); Linde v. Arab Bank, PLC, 262 F.R.D. 136, 142 (E.D.N.Y. 2009) ("But clearly, a commitment by a parent to make its subsidiary's information available does not establish the converse — that the subsidiary has access to the parent's information.").

The third case is ostensibly on point. See In re Vivendi, S.A. Secs. Litig., 2009 WL 8588405 (S.D.N.Y. July 10, 2009) (Pitman, Mag.). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

███████████████████████████████████████████

███████████████████████████████. But, quite aside from the fact that this Court does not find the reasoning in Vivendi persuasive, its outcome is distinguishable in any case because of ███ ███████████████████████████████████████████, which substantially inform the Court's finding that [BANK-1] has practical "control" over [BANK SUBSIDIARY] and its documents, and thus must use best efforts to produce responsive [BANK SUBSIDIARY] documents to comply with the subpoenas.

Specifically, ████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████ Today, [BANK-1] leadership is responsible for the compliance, risk management, governance, and financial reporting operations for subsidiaries including [BANK SUBSIDIARY].

10

███████████████ ([INCREASED BANK AUTHORITY OVER BANK SUBSIDIARIES WITH MORE SIGNIFICANT RISKS]); ████████ (explaining that [BANK-1] risk management is overseen by two committees of the parent, and describing [INTEGRATION OF RISK FUNCTION IN MANAGEMENT OF SUBSIDIARIES]); ████████ (extolling [BANK-1]'s commitment to professional standards ████████████); ████████ ([CONSOLIDATED FINANCIAL STATEMENTS PREPARED BY BANK INCLUDE SUBSIDIARIES]).

Further, [BANK SUBSIDIARY] and [BANK-1] hold themselves out to the public as significantly intertwined. In [YEAR], [BANK SUBSIDIARY] established a new executive committee to [IMPROVE COORDINATION] with [BANK-1] ████████████████████████ ████████ Calhoun Decl. Ex. I at 2 (████████████████ ████). As a result, [BANK SUBSIDIARY] expressly holds itself out as "the wealth-management arm of [BANK-1]." Calhoun Decl. Exs. E-U (press releases). This evidence of closely intertwined operations is reinforced by the fact that, directly or indirectly, every [BANK SUBSIDIARY] entity is wholly owned by [BANK-1]. Decl. of ████████, dated [DATE], Ex. P ¶ 7 (Declaration of ████████████). Further, numerous individuals hold interlocking positions with [BANK-1] and [BANK SUBSIDIARY], Calhoun Decl. ¶ 22, or hold

positions with [BANK-1] that involve responsibilities for all [BANK-1] entities including [BANK SUBSIDIARY], id. ¶ 23.

In sum, then, here is a parent corporation that wholly owns its subsidiaries and has "established basic principles for coordination of the activities of its subsidiaries," including "a clear vision of a . . . global business, requiring cooperation and coordination among its many parts." Ski Train, 2006 WL 1328259, at *7. There is substantial "overlap between the managing executives for [the parent] and the [subsidiary]." Dietrich, 2000 WL 1171132, at *4. Even if, as it contends, [BANK-1] cannot "legally compel" some of its subsidiaries to produce responsive documents to the subpoenas, Ski Train, 2006 WL 1328259, at *7, the showing made by Motorola is more than sufficient to establish that [BANK-1] has the "practical ability to request from, or influence" [BANK SUBSIDIARY] entities to comply with the subpoenas and Discovery Order. Commonwealth of the N. Mariana Is., 21 N.Y.3d at 62. This is true even though [BANK SUBSIDIARY] entities maintain separate customer-account databases and observe corporate formalities.

Accordingly, the Court holds that [BANK-1] has practical "control" over its wholly owned subsidiaries within [BANK SUBSIDIARY] and their documents for the purposes of discovery under Fed. R. Civ. P. 45 and N.Y. C.P.L.R. § 5224, and therefore orders

[BANK-1] to use its best efforts to produce to Motorola and the Court by December 1, 2013 the following:

(a) a detailed description of any documents or Uzan Property located by any search conducted in response to this Opinion and Order, the Discovery Order, or the Injunction and Restraining Order, including a detailed description of the document or Uzan Property, where and when it was located, and how it was located;

(b) the identity of the branches, divisions, subsidiaries, and affiliates whose records [BANK-1] searched or whose own searches were reported to [BANK-1], and a detailed description of the methodology used in each search;

(c) the identity of the branches, divisions, subsidiaries, and affiliates whose records were not searched, who refused [BANK-1]'s request for assistance in the search, or whose customer information is not contained in the databases searched, and any documents demonstrating the above;

(d) the exact date each such search was begun, where it took place, and who conducted it;

(e) a description of what efforts, if any, [BANK-1] made to determine if it, or any of its branches, divisions, subsidiaries, or affiliates did business with the Uzans or any Uzan Proxy under any name or identity not contained in Exhibit A to the Injunction

13

and Retraining Order, including the involvement of [BANK-1]'s compliance department or personnel responsible for Know-Your-Customer and anti-money-laundering protocols; and

(f) all non-privileged documents detailing [BANK-1]'s efforts to secure compliance with the subpoenas from its subsidiaries, including without limitation internal communications, communications with affiliates or subsidiaries, and documents relating to any basis on which [BANK-1] alleges it could not or would not search in a particular jurisdiction, affiliate, or subsidiary, as well as a log describing all allegedly privileged documents detailing these compliance efforts that were withheld.

Should [BANK-1] discover responsive documents that it believes cannot be produced to Motorola or the Court without violating foreign law other than [FOREIGN] law, it should immediately convene a conference call with Motorola and chambers to set a briefing schedule concerning the legal regime of the particular countries implicated ([FOREIGN] law having already been fully briefed).

Finally, because [BANK-1] has acted in good faith in defending against the subpoenas, including its non-frivolous objections to searching subsidiaries, and has conducted required searches after previous Court rulings clarified ambiguities of the subpoenas'

scope, the Court declines Motorola's invitation, for now, to hold [BANK-1] in contempt or require it to pay Motorola's costs.

SO ORDERED.

Dated:   New York, New York
         October 31, 2013

_____
JED S. RAKOFF, U.S.D.J.