UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOTOROLA CREDIT CORP., et al.<br><br>Plaintiff,<br><br>-v-<br><br>KEMAL UZAN, et al.,<br><br>Defendants. | Civil Action No.  02-cv-0666 (JSR)(FM)<br><br>FILED UNDER SEAL<br><br>REPLY DECLARATION OF SINAN UZAN |

I, Sinan Kemal Uzan, declare under penalty of perjury that the following is true and correct:

1.      I am a 27 year old United States citizen and resident of New York, New York.

2.      I submit the following declaration in further support of my motion to intervene in the above-referenced litigation (the "Litigation"), challenge the Order, and obtain the evidence submitted against me.

3.      Since the time plaintiff Motorola Solutions Credit Company LLC f/k/a Motorola Credit Corporation ("MCC") first contacted me to obtain discovery in the Litigation, I have cooperated fully in every respect.  I have, without objection, sat for a deposition and willingly provided to MCC thousands of documents, many of which MCC now attempts to use against me in its opposition to my motion to intervene.

4.      I have fully complied with my discovery obligations and, to the best of my knowledge, my counsel has not withheld any relevant, non-privileged documents.

5.      Moreover, I have voluntarily subjected myself to the jurisdiction, authority, and discipline of this Court for one reason:  to assert that I am not now, nor have ever been, an Uzan Proxy, and to challenge the Court's designation of me as such.

My Desire to Intervene.

6.      I am not an Uzan Proxy.  My desire to intervene in the Litigation is for the sole purpose of challenging this Court's designation of me as an Uzan Proxy.

7.      My motion to intervene has absolutely nothing to do with obtaining documents for the purpose of passing them along to my paternal family members.  Since I have become actively involved in the Litigation via Motorola's discovery requests, I have disclosed to my mother and father only that I received a subpoena for documents related to the matter. I did not discuss any of the substance of the subpoena or of anything else that I may have learned since becoming involved in the Litigation.  I have and will continue to respect the seal in place in the Litigation.

8.      Despite MCC's unsupported assertion to the contrary, I seek only those documents that MCC submitted to the Court in support of their application to declare me specifically an Uzan Proxy.  As I will show if the Court allows me, I am not a part of any "integrated web of companies" related to my paternal family, and I have no interest in any of the documents supporting any other individual's or entity's designation as an Uzan Proxy.

**Background of My Involvement in the Litigation**

9.      Despite MCC's insinuations to the contrary, there is no nefarious explanation to the history of my legal representation in connection with the Litigation.

10.     In or around May 2013, I engaged the Kakar law firm to investigate the circumstances surrounding the freezing of my Bank of America accounts.

11.     After providing Ms. Kakar with the information I had (which was very little), I requested that Ms. Kakar reach out to MCC's attorneys to determine why my bank accounts had been frozen.

12.     After her conversation with MCC's attorneys, and with no explanation to me, Ms. Kakar abruptly withdrew as my counsel.  I was never provided with an explanation regarding her withdrawal and she did not provide me any further information about the freezing of my bank accounts.  A true and correct copy of an email discussion between me and Ms. Kakar, discussing her withdrawal, is attached hereto as Exhibit 1.

13.     After Ms. Kakar's withdrawal, I was referred to Mr. Hua and Ms. Tracy Yuan, of Hua & Wang PC.   Again, Mr. Hua and Ms. Yuan reached out to MCC's counsel to investigate the circumstances surrounding the freezing of my Bank of America accounts.

14.     I never instructed Mr. Hua or Ms. Yuan that the Bank of America accounts represented my "life savings" or "that I had not seen my father in more than ten years," and am unaware why Mr. Hua would make such statements if indeed he did.

15.     After Mr. Hua and/or Ms. Yuan contacted MCC and explained to me what he had learned, I realized that it was likely that the scope of the matter was too great for a practitioner in a small law firm to handle.  I therefore took the matter to Chadbourne & Parke LLP.

16.     Although MCC characterizes the timing of my motion as "telling," and points to the fact that I elected not to challenge the turnover of my Bank of America account, I believe MCC knows precisely why I chose not to challenge that turnover.  As my counsel stated to MCC in a September 3, 2013 letter—which I have provided previously to the Court—I hoped that "by acceding to [the] turnover motion and [ ] explaining my lack of involvement in the business activities of [my] father's side of the family [it would] resolve any issues [MCC] may have [had] with [me]."

17.     Because the freezing of my bank accounts was connected to the litigation commenced by MCC against my father, initially I did discuss the freeze with my father and I did seek his advice regarding obtaining counsel, as I had no experience navigating complex legal proceedings and did not know any lawyers capable of handling this matter.  I have never denied doing so and indeed have been upfront about the fact that I maintain a father/son relationship with my father, and regularly communicate with him, (including visiting him in France) to the extent that is possible under the circumstances.

18.     My father has not, however, provided any financial support for my representation in this matter and has in no way been involved in any of the decisions regarding or direction of my legal representation, other than, as stated above, my initial consultation with him regarding obtaining appropriate counsel.

19.     Moreover, since I have learned of the strict seal governing the Litigation, which I was unaware of (due to my lack of access to the Order) at the time of the communications MCC has attached to its opposition brief, I have shared nothing with my father that is in any way related to the Litigation, other than what I have already disclosed above.

**Discussions with My Father Regarding Business Opportunities**

20.     As I have previously stated, I maintain a normal father/son relationship with my father.  Because of my father's lengthy history as a businessman involved in a great variety of businesses, this relationship includes my sometimes seeking my father's advice when I am approached with an investment opportunity that I am considering investing in.

21.     Sometimes when I consult my father regarding such investments, he further consults my uncle.

22.     MCC characterizes such discussions with my father as me "sen[ding] business and investment opportunities directly to Cem Uzan and Hakan Uzan," but that is not the case.

23.     As I explained candidly at my deposition:

> I have a lot of people bring me investment opportunities . . . because I have a lot of people who are successful business people, and they want to try to raise money . . . so I was looking for other means to start up my own business or some kinds of investments.  So, I would send ideas to get my father's input . . . basically to get his opinion on whether it was a good business or if it wasn't, or just generally.

S. Uzan Deposition Tr. ("Uzan Tr.") at 200-01.  True and correct copies of relevant deposition transcript excerpts are attached hereto as Exhibit 2.

24.     I also testified as to my uncle's involvement:  "Most of the time or some of the time, my father, I believe, forwarded these [potential investments for me] to my uncle.  I might have sought his advice on a few of them, yes."  *Id.* at 202.

25.     As I believe MCC well knows, the handful of emails it has provided the Court relate only to my seeking my father's advice regarding my potential investments.  I have never "funneled" any business opportunity to my father or uncle.

-4-

26.     Of any business opportunities that I have discussed with my father and/or uncle, I invested in only one, Streamworks, an on-line video streaming company, which, as I mention in my initial papers, was funded by my paternal grandfather.

**I Had No Active Involvement in the JDC Acquisition**

27.   . Dinesh Sadhwani ("Mr. Sadhwani") is a friend that I met while I attended Pepperdine University.

28.     I have had no active participation in the JDC transaction referenced in MCC's opposition other than to (1) provide to my father the contact information for Mr. Sadhwani, (2) forward to my father unsolicited messages that Mr. Sadhwani would send me regarding he and my father's and/or uncle's business together, and (3) inform Mr. Sadhwani that I would not get involved in his and my uncle and/or father's business.

29.     I had no further knowledge of any business that Mr. Sadhwani may have had with my father.

30.     Despite MCC's unsupported accusation to the contrary, I did not introduce my father or my uncle to Mahesh Harilela.  To this day, I do not know who that is outside of the context of the Litigation.

31.     Like Mr. Sadhwani, my uncle would occasionally provide me unsolicited updates regarding his business with Mr. Sadhwani.  I assume that he did so only because he knew Mr. Sadhwani was my friend from college.

32.     For instance, in Exhibit 23 to MCC's opposition brief, my uncle let me know that he met with Mr. Sadhwani and Mr. Sadhwani's uncle.  In my reply to my uncle, which begins with "This is what he texted me last," I cut and pasted a text message that I received from Mr. Sadhwani, which began with "I'll tell you" and ended with "more comfortable."  Importantly,

the text stating "if things went bad and I am the face, then it could really haunt me" was Mr. Sadhwani's language, not mine. I informed MCC of this at my deposition. I did state to my uncle that Mr. Sadhwani was someone my uncle could trust.

33.    It is my understanding that at some point Mr. Sadhwani's business relationship with my father and/or uncle ended on bad terms.

34.    In MCC Exhibits 24 and 25, I am forwarding to my father messages that Mr. Sadhwani sent to me, unsolicited. It appeared as though Mr. Sadhwani was attempting to contact my father and/or uncle, without success, and was therefore trying to reach out to me to get me involved. I forwarded the messages to my father because I had no knowledge of what Mr. Sadhwani's grievance was, or what dispute he may have had with my father. I did realize, however, that Mr. Sadhwani was upset.

35.    As MCC Exhibit 25 reflects, after I forwarded a message to my father from Mr. Sadhwani in which Mr. Sadwhani was attempting to get me to set up a meeting between Mr. Sadwhani and my uncle, my father instructed me to "just . . . ignore" Mr. Sadwhani, which I did.

36.    Moreover, as Exhibit 25 further reflects, I discussed with my father that I was going to respond to Mr. Sadhwani that "I only introduced you guys," and that "I don't know what deals you have made nor what those deals are, the money negotiated, the terms, etc. Whatever your deal was it was your deal and terms with them."

37.    Finally, Exhibit 25 reflects Mr. Sadhwani's response to my message to him, which I also forwarded to my father. In the message, Mr. Sadhwani states that he "will try to contact them directly, although they never respond," and that he hoped I understood his "position in this and let's just leave it at that and continue being friends as normal."

38.     Though MCC characterizes my "role" in the JDC acquisition as "pivotal", it does not point to any communications showing that I actually participated in the acquisition. The reason for the absence of this evidence is because I had (and continue to have) no participation in any business of my father or my uncle.

**I Am Not a Part of the "Uzan Legal Team"**

39.     Other than receiving updates on my father's legal proceedings, and being coincidentally present when his attorneys came for meetings during my visits to him, I have had no active involvement in any legal case of my father's or uncle's.

40.     As I candidly disclosed during my deposition, my father and possibly my uncle sent me emails updating me on the status of the litigation my father was involved in overseas. On occasion they would attach filings from those cases. I have never denied this.

41.     My father keeps me updated on his case because it is a significant matter occurring in his life and I care for my father.

42.     I have no involvement in paying my father's lawyers.

43.     Contrary to MCC's assertion, MCC Exhibit 40 does not reflect that I was paying my father's lawyers. In Exhibit 40, my father is sending me his latest legal filing. However, beginning with the sentence that starts "also toady [sic] am gonna," my father is discussing an entirely different subject.

44.     As I will state in greater detail below, at the time of the communication reflected in Exhibit 40, I was working with an immigration lawyer in California to explore sponsoring a green card for my then-stepmother. The references in that email to "80 grand" and going to "the lawyer [to] file this last part" are related to the green card issue, not my father's litigation.

<u>My Stepmother's Green Card</u>

45.    In early 2009, my father's wife, Alara Kocibey, asked if I would sponsor a green card so that she could come to the United States.  I agreed to look into the matter.

46.    At that same time, I engaged a California immigration attorney, Mathew Millen, to assist me in exploring the possibility of sponsoring a green card for my step mother.

47.    Mr. Millen initiated the process by filing the initial petition.

48.    At that time, Mr. Millen instructed me that, in order to qualify to sponsor my stepmother for a green card, I would need (to the best of my recollection) at least $125K in assets to reflect that I could support her.

49.    MCC Exhibits 29, 30, 31, 32, 39, 40, 41, and 46, which all occur between March and June 2009, deal with my step mother and her sister, Seben, sending me money for the purpose of building $125,000 in assets so that I could sponsor my stepmother's green card.

50.    In Exhibit 29, after my father sent me his latest court filings, I asked him "how ala* should send the money over here."  My father responds that "ala is waitin 4 u to return 2 la then will do it w.western union."  Contrary to MCC's assertion, I was not asking my father for money, but rather was asking my father how Alara should send the money for the green card sponsorship.

51.    In Exhibit 30, my father asks me "did u recv the remainin fnds 4 your account? Need 2 knw 4 ala applctn?"  Again, my father is asking whether I received funds for my stepmother's green card application.

52.    In Exhibit 31, I tell my father that I "talked to the person in Wwood, they informed me the amount in one's b account had to be 125k.  trying to put car as valued asst, but so far so good . . . ."  Mr. Millen's office was in the Westwood District of Los Angeles.

53.     In Exhibit 32, my father is asking for clarification as to whether, in the email in Exhibit 31, I meant that I had to have $12,500 in assets or $125K in assets.

54.     In Exhibit 39, I tell my father that "to my understanding with the lwyr here, I don't need necessarily $ but a value of assets . . . so maybe we can move forward since there are things that can close the gap . . . ."

55.     In Exhibit 40, my father tells me that he was "gonna see your mom" and that she was going to "transfer [to me] 80 grand in the next few days . . . ." My father further states, "so please go to the lawyer asap and lets file this last part . . . ." It is my understanding that my father asked my mother to send me $80K for my stepmother's green card application, but my mother refused. Nevertheless, this email reflects further efforts to obtain a green card for my stepmother, not financial support from my father.

56.     In Exhibit 41, my father asks me to forward a document to "matt" in order to explain certain "criminal charges against alara" that were relevant for her immigration proceedings.

57.     Each of the emails translated in Exhibit 46, all of which occur in the same time period, relate to the same effort to build approximately $125K in assets for the sponsorship of my stepmother's green card.

58.     I note that in the communication reflected in Exhibit 46, SKU0003592, the phrasing used by the translation is incorrect. The reference to my "mother" sending me "45 dollars" is not to my mother, but rather to my stepmother's sister, "Sieben."[1] As MCC knows, my mother's name is not "Sieben," but rather, Sebnem. *See* Ex. 2, Uzan Tr. at 54:11-12.

59.     I also note that the reference in Exhibit 46, SKU0002779, to amounts my mother had sent and would send me (*i.e.*, 18 euros and 15 euros, respectively) simply reference the

---

[1] The correct spelling of my former stepmother's sister is "Seben," but my family often referred to her as "Sieben."

monthly allowance that I receive from my mother, which my father was aware of as I factored it into the total assets I would need to show when I applied to sponsor my stepmother's green card. My mother, however, had no involvement in my attempt to sponsor my stepmother's green card.

60.    In late 2009, my father and my stepmother separated. Their eventual divorce was extremely contentious and ended on very bad terms. After the divorce, neither my former stepmother nor her sister ever contacted me again, and, thus, I did not return the monies I received from them.

61.    Those amounts were sent to me by my stepmother and her sister, over four years ago, in order for me to do a favor for my stepmother. I did not think of that as financial support from my father, uncle, or any other judgment debtor when I prepared my original declaration but, in retrospect, I regret not having recalled the events surrounding those transfers as I would have referenced them. Again, I produced to MCC the communications reflecting those transfers. I do not have anything to hide.

62.    Despite MCC's assertions in its opposition to my Motion to Intervene, it knew that the above discussions related to my potential sponsorship of a green card for my stepmother. *See, e.g.*, Ex. 2, Uzan Tr. at 271-73.

63.    Every painting I have purchased was paid for with money from either (1) my maternal family; (2) my personal income; or (3) the sale of other assets such as my car (which was not paid for with any funds from my father or any other Judgment Creditor).

**Additional Emails**

64.    In Exhibit 46, SKU00038727, my father had requested my Bank of America account information and stated that he was going to send me money. Although I cannot recall

this exact conversation, I do know that neither my father, nor anyone at his behest, wired me any funds as a result of this conversation.

65.     Indeed, absent from MCC's submission is any evidence of any wire transfer from my father to me.  The reason for this lack of documents is the fact that I have not taken or received any funds from my father, other than what I have disclosed previously to the Court.

66.     MCC's assertions that the above documents "have fallen through the cracks" is entirely disingenuous, as, to the best of my knowledge, my counsel has provided MCC with any relevant document in my possession.

67.     Exhibits 43 and 44 reflect that I agreed to help my uncle find a rental property in Los Angeles for a friend of his.  MCC asserts that this friend was the King of Jordan.  This email reflects nothing more than the fact that I helped my uncle find a rental property because I lived in Los Angeles at the time.

68.     In Exhibit 45, I am agreeing to allow my uncle's wife to register two cars at my Los Angeles address, as she was coming to visit Los Angeles for an extended visit.  However, to the best of my recollection, the registrations never took place.

Sinan Kemal Uzan

Executed on February 28, 2014