

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
MOTOROLA CREDIT CORPORATION and       :
NOKIA CORPORATION,                    :
                                      :
            Plaintiffs,               :        02-cv-666 (JSR)
                                      :
      v.                              :        OPINION AND ORDER
                                      :
KEMAL UZAN, et al.,                   :
                                      :
            Defendants.               :
----------------------------------x

JED S. RAKOFF, U.S.D.J.

      On July 31, 2003, this Court awarded plaintiff Motorola Credit

Solutions f/k/a Motorola Credit Corporation ("Motorola") damages in

excess of $2 billion against defendants Kemal Uzan, Murat Hakan

Uzan, Cem Cengiz Uzan, Melahat Uzan, Aysegul Akay, and Antonio Luna

Betancourt (the "Uzans"), based on the Uzans' fraudulent diversion

to their own purposes of loans of this magnitude made by Motorola

to Telsim, a Turkish telecommunications company owned in large part

by the Uzans. See Opinion and Order, No. 02-cv-666, ECF No. 453

(S.D.N.Y. July 31, 2003). In June 2006, Motorola obtained an

additional judgment of $1 billion in punitive damages. See Order,

No. 02-cv-666, ECF No. 675 (S.D.N.Y. June 15, 2006). Motorola has

been trying to collect its judgment ever since, but the Uzans —

most of whom are fugitives from criminal indictments in Turkey

brought as a result of a separate fraud —— have evaded payment, not least by utilizing an international web of proxies and shells to hide their assets and evade payment. As a result, the Court, in November 2012, permitted Motorola to serve ex parte discovery requests on third parties to gather information about "Defendants' and/or their agents' assets or whereabouts." Order Regarding Service of Ex Parte Discovery Requests, No. 02-cv-666 (S.D.N.Y. Nov. 19, 2012).

Based on the discovery thus obtained, as well as other evidence supplied by Motorola, the Court, on February 13, 2013, issued an injunction and restraining order, which (1) enjoined the Uzans, their agents, and anyone receiving notice of the Order from transferring or dissipating any Uzan assets until Motorola's judgment is paid in full; and (2) required any subpoenaed party in possession of property of the Uzans or their agents to immediately freeze and restrain access to such property. See Order Granting Injunctive Relief and Restraining Order ("Injunction and Restraining Order"), No. 02-cv-666 (S.D.N.Y. Feb. 13, 2013). Attached to the Injunction and Restraining Order was a list of "Uzan Proxies," defined as "entities or persons that serve as agents or instrumentalities of or are otherwise controlled, directly or indirectly, by the Uzans." Id. ¶ 10.

2

Beginning on February 14, 2013, Motorola served the Injunction and Restraining Order, along with subpoenas duces tecum permitted by the November 2012 discovery order, on the New York branches of a large number of domestic and international banks. In response, many of the banks challenged the applicability to their foreign branches of both the discovery order and the asset freezing order. The latter challenges were eventually resolved by the Court in an Opinion dated August 1, 2013, that held that New York's "separate-entity rule" precluded the turnover of Uzan assets held at foreign branches of banks whose New York branches had been served with the Injunction and Restraining Order. See Motorola Credit Corp. v. Uzan, 978 F. Supp. 2d 205 (S.D.N.Y. 2013). That decision, specifically involving assets held at a foreign branch of Standard Chartered Bank, was appealed to the Second Circuit, which certified the question of the vitality of the separate-entity rule to the New York Court of Appeals. On October 23, 2014, the New York Court of Appeals held that the separate-entity rule remains intact. Motorola Credit Corp. v. Standard Chartered Bank, 24 N.Y.3d 149, 163 (N.Y. 2014). Accordingly, on November 14, 2014, the Second Circuit, adopting that ruling, affirmed this Court's August 1, 2013 Opinion and directed that this Court lift any remaining attachments of assets of Standard Chartered. Motorola Credit Corp. v. Standard

3

Chartered Bank, 771 F.3d 160 (2d Cir. 2014). On December 5, 2014, the Second Circuit mandate issued and was duly docketed. No. 02-cv-666, ECF No. 1046 (S.D.N.Y. Dec. 5, 2014).

Although the mandate technically applies only to Standard Chartered, the reasoning of the foregoing decisions of the New York Court of Appeals and the Second Circuit clearly governs all similarly situated banks, and accordingly, the Court hereby lifts any remaining attachment of any Uzan assets held by a foreign branch of a bank whose New York branch was served with the February 2013 attachment order where no other basis for the attachment exists.

This, however, does not moot the November 2012 discovery order, since Motorola still has a significant interest in finding out in what foreign branches of the subpoenaed banks the Uzans are holding funds, so that it may then seek to obtain such funds through proceedings in the relevant countries. Here again Standard Chartered has taken the lead in litigating the reach of the discovery order, and on August 12, 2013, the Court held, on grounds of international comity, that Standard Chartered need not produce documents responsive to the subpoena that were held by Standard Chartered branches in Jordan and the United Arab Emirates ("UAE"). See Memorandum Order, Motorola v. Uzan, 293 F.R.D. 595 (S.D.N.Y.

4

2013). Motorola then moved for reconsideration of that Memorandum
Order.

Independently, numerous other banks challenged the discovery
order as applied to some or all of their foreign branches, and
Motorola, for its part, made several motions to compel compliance
with the discovery order. Some of these motions have been dealt
with preliminarily, see, e.g., Motorola v. Uzan, No. 02-cv-666,
2013 WL 6098388 (S.D.N.Y. Nov. 20, 2013) (redacted Opinion and
Order directing a bank to search its subsidiaries in compliance
with such a subpoena); Redacted Memorandum Order, No. 02-cv-666,
ECF No. 899 (Dec. 16, 2013) (ordering a bank to conduct a search to
determine whether there is a "true" and not "hypothetical" foreign-
law conflict), but the Court now undertakes, in this Opinion and
Order, to deal with these discovery matters more globally by laying
out certain basic principles and considerations that can then be
applied to each particular motion (some of which are resolved
here).[1]

The primary question here presented — whether a New York
judgment creditor, through subpoenas issued on New York offices of

---

[1] Because these motions were briefed under seal, this non-sealed
Opinion and Order necessarily speaks somewhat in generalities and
omits citations to some of the details set forth in the parties'
papers and affidavits accompanying them.

5

international banks, can obtain discovery regarding accounts held
by the judgment debtors or their agents in various foreign branches
of these banks — is hardly a new one, and has often turned on
whether the foreign laws governing the foreign branches prohibit
such discovery and, if so, whether such foreign laws should be
given deference here. More often than not, such deference has not
been accorded. See, e.g., Richmark Corp. v. Timber Falling
Consultants, 959 F.2d 1468 (9th Cir. 1992) (affirming order of
production notwithstanding Chinese secrecy laws); Strauss v. Credit
Lyonnais, 249 F.R.D. 429, 438 (E.D.N.Y. 2008) (refusing protective
order sought on basis of French bank secrecy law); British Int'l
Ins. Co. v. Seguros La Republica, S.A., No. 90-cv-2370, 2000 WL
713057 (S.D.N.Y. June 2, 2000) (declining to defer to Mexican bank
secrecy law); Alfadda v. Fenn, 149 F.R.D. 28 (S.D.N.Y. 1993)
(denying protective order sought on the ground of Swiss bank
secrecy); United States v. Chase Manhattan Bank, N.A., 584 F. Supp.
1080 (S.D.N.Y. 1984) (refusing protective order sought on basis of
Hong Kong bank secrecy law). See also NML Capital, Ltd. v. Republic
of Argentina, No. 03-cv-8845, 2013 WL 491522 (S.D.N.Y. Feb. 8,
2013) (expressing frustration with objecting party's belated
foreign-law objections and ordering production notwithstanding
asserted conflicts with Spanish data protection laws, Brazilian

6

bank secrecy laws, a Bolivian sovereignty statute, the Chilean bank secrecy law, the Panamanian Constitution and other laws, the Paraguayan Constitution and other laws, the common law in the Cayman Islands, Argentina's bank secrecy law, and Uruguayan bank secrecy law).

All these cases, however, recognize the primacy in this area of law of the Supreme Court's decision in Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa, 482 U.S. 522 (1987). There, the Supreme Court held that the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, to which the United States is a signatory (codified at 28 U.S.C. §§ 1781-1785), did not provide the exclusive or mandatory procedure for obtaining documents located abroad, did not require first resort to the Hague Convention, and did not deprive a district court of its power to order those subject to its jurisdiction to produce documents located abroad. Nevertheless, such document requests had to be decided with full consideration of international comity, which "requires in this context a more particularized analysis of the respective interests of the foreign nation and the requesting nation…." Aerospatiale, 482 U.S. at 543-44.

7

More specifically, the Supreme Court, drawing on the
Restatement (Third) of the Foreign Relations Law of the United
States (Tentative Draft No. 7, 1986), identified five factors
relevant to deciding such applications: "(1) the importance to the
… litigation of the documents or other information requested; (2)
the degree of specificity of the request; (3) whether the
information originated in the United States; (4) the availability
of alternative means of securing the information; and (5) the
extent to which noncompliance with the request would undermine
important interests of the United States, or compliance with the
request would undermine important interests of the state where the
information is located." Id. at 544 n.28 (ellipsis in original).[2]

---

[2] A Southern District decision contemporary with Aerospatiale —
Minpeco, S.A. v. Conticommodity Services, Inc., 116 F.R.D. 517
(S.D.N.Y. 1987) — cited a similar list of factors drawn from the
Restatement (Second) of the Foreign Relations Law of the United
States (1965) for resolving conflicts of law not specific to
document production: "(a) vital national interests of each of the
states, (b) the extent and the nature of the hardship that
inconsistent enforcement actions would impose upon the person, (c)
the extent to which the required conduct is to take place in the
territory of the other state, (d) the nationality of the person,
and (e) the extent to which enforcement by action of either state
can reasonably be expected to achieve compliance with the rule
prescribed by that state." Minpeco, 116 F.R.D. at 522. The first
two factors, the Minpeco Court found, had always been by far the
most important, but Courts had also considered for discovery, in
addition, "the importance of the information and documents
requested to the conduct of the litigation" and "the good or bad
faith of the party resisting discovery." Id. As it happens, in the

Most of the Aerospatiale factors apply identically to all the
motions here under consideration. As to the second Aerospatiale
factor, involving the degree of specificity of the request, the
subpoenas are all substantially identical. Furthermore, this Court
has already determined that "Motorola's subpoena requests are as
narrowly tailored as reasonably possible given the Uzans' diverse,
complex, and concerted efforts to conceal their assets from their
creditors, and, in this context, the requests are not excessively
overbroad or burdensome." Motorola, 293 F.R.D. at 599-600. As to
the third Aerospatiale factor, the documents in question all
originated abroad, see id. at 600 — although "this factor is not
determinative." NML Capital, 2013 WL 491522, at *10.

The first Aerospatiale factor, the importance to the
litigation of the documents requested, is also identical across the
motions, but varies somewhat with the particular request. In this
regard, moreover, the Court, on Motorola's motion for
reconsideration, partially modifies its prior determination that
the documents have only modest value. That determination rested on
the fact, since reconfirmed, that any Uzan funds identified as
being held in a foreign branch of a subpoenaed bank cannot be here

_____

motions here at issue, the Aerospatiale and Minpeco factors
effectively apply in identical fashion.

9

attached given the separate-entity rule. Motorola, 293 F.R.D. at
599. However, the Court is now satisfied that Motorola cannot
realistically seek attachment of these funds in lawsuits commenced
in the relevant nations unless it first learns where the funds are
located, such as by the discovery here sought. Furthermore, the
fact that the laws of some countries may place obstacles in the
path of Motorola's attempts to domesticate its judgment in those
countries does not mean that the documents will not tell Motorola
where to try.

Accordingly, the importance of the documents, as a general
matter, is somewhat higher than the Court previously indicated.
Their importance does vary, however, based on how crucial a
particular set of requested documents is to assisting in locating
the hidden funds. For example, a request for information about a
bank's communications about the Injunction and Restraining Order
with persons other than the Uzans is less important than a request
for information about the Uzans' or their agents' accounts or their
own communications.

As to the fourth Aerospatiale factor — "the availability of
alternative means of securing the information" — none of the banks
here involved has shown to the Court's satisfaction that Motorola
is as likely to obtain information regarding the Uzans' concealed

10

funds, either through resort to the Hague Convention or by means of
proceedings brought in the countries with which these motions are
primarily concerned, as it is in the proceedings here pending. With
respect to proceedings brought directly in such countries, this is
because most of these countries have blocking statutes that
prohibit their courts from releasing this information. Although, as
discussed below in connection with the fifth factor, some of these
countries will acquiesce in banks' complying with orders of U.S.
courts to release such information, none is prepared to
affirmatively order banks in their jurisdictions to provide such
information. As for the Hague Convention, there are substantial
questions as to whether the instant applications fall within the
scope of that treaty, and litigation of that issue, even if
ultimately resolved favorably to Motorola, would occasion
substantial delays. Moreover, it is doubtful whether the Hague
Convention proceedings could be kept confidential from the Uzans,
without which such proceedings would be pointless, since the Uzans
could simply move their monies to new accounts in the names of new
proxies in new jurisdictions. Finally, it appears doubtful that
courts of these countries would treat the Hague Convention as
overriding their own blocking statutes.

However, while the four factors canvassed above generally favor Motorola's applications, it must not be forgotten that what we are concerned with here is a comity analysis, and from that standpoint the most important factor is the fifth factor: "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." Here, there is an obviously strong U.S. interest in enforcing the final judgment of a federal court, even if the judgment is designed to protect the property rights of a private party. On the other hand, several of the nations whose laws are here involved have enacted legislation prohibiting the release of some or all of the information here sought, sometimes on pain of criminal prosecution, thereby suggesting a strong competing interest. But is this for real? If a given country truly values its national policy of, say, criminalizing compliance with a U.S. court subpoena, it will prosecute its citizens for so complying. More generally, whether the prohibition against disclosure be civil or criminal in nature, the extent to which the relevant country has actually enforced the prohibition is a strong indicator of the strength of the state interest.

Regrettably, the expert opinions that accompany the parties'
motion papers in each of these motions provide in most cases little
hard or detailed information as to the degree to which various
nations here involved actually enforce their prohibitions against
disclosure. Despite this limitation, however, the Court, on the
basis of the materials here provided, reaches the following
conclusions with respect to several of the nations here involved,
namely, France, Switzerland, Jordan, and the UAE:

France. France, like many other civil law and some common law
countries, has enacted a so-called "blocking statute," Law No. 80-
538 of July 16, 1980, which provides in Article 1 bis that "no
person may … transmit, in writing, orally, or in any other form,
documents or information of economic, commercial, industrial,
financial, or technical nature, intended for the constitution of
evidence in connection with pending or prospective foreign judicial
or administrative proceedings." Article 3 of that law authorizes
not only fines but up to six months' imprisonment for violations of
Article 1 bis. On its face, then, the French blocking statute would
prohibit not just a bank but anyone in France from complying with
U.S. court-ordered discovery, on pain of imprisonment. "Article One
is explicitly intended to protect the 'sovereignty, security, and
vital economic interests' of France." Compagnie Francaise, 105

13

F.R.D. at 30. Its language is mandatory, it speaks specifically to
the conduct contemplated by an order compelling production
(although not specifically to banks), and it even invokes "vital"
interests like security and sovereignty as its fountainhead
(although not an interest as specific as consumer privacy or
confidence in the banking system).

But, as the Supreme Court stated in discussing the French
blocking statute in Aerospatiale, "American courts are not required
to adhere blindly to the directions of such a statute."
Aerospatiale, 482 U.S. at 544 n.29; and, as it turns out, "[i]t is
inconceivable that Law No. 80-538 is to be taken at face value as a
blanket criminal prohibition against exporting evidence for use in
foreign tribunals." Adidas (Canada) Ltd. v. SS Seatrain Bennington,
No. 80-cv-1911, 1984 WL 423, at *4 (S.D.N.Y. May 30, 1984). In
actuality, the law is riddled with loopholes that make it
substantially unenforceable. This was no accident:

> [The relevant] report to the French National Assembly
> recommended the law's adoption on the ground that it
> would offer French nationals "a legal excuse for
> refusing to supply the information and documents
> demanded of them [and] a judicial weapon which will at
> least make it possible for them to gain time. The
> conflict thus created will block matters for a time
> and will make it possible to raise the conflict to a
> governmental level." With respect to the potential
> penalties, the report noted that "it is necessary not
> to misunderstand the actual scope of these penalties …

14

[because] these penalties are applied only on the
improbable assumption that the companies would refuse
to make use of the protective provisions offered to
them. In all other cases, these potential fines will
assure foreign judges of the judicial basis for the
legal excuse which companies will not fail to make use
of."

Id. at *4 n.4 (internal citation omitted).

In practice, as a result, it appears that when a foreign court

orders production of French documents even though the producing

party has raised the "excuse" of the French blocking statute, the

French authorities do not, in fact, prosecute or otherwise punish

the producing party. Accordingly, the French interests considered

as part of the fifth Aerospatiale factor are not enough to override

the U.S. interest in enforcing its judgments, let alone the other

factors favoring Motorola's position. Therefore, the Court hereby

orders compliance with the subpoenas so far as documents located in

France are concerned.

Switzerland. In contrast with the French situation,

Switzerland's bank secrecy regime constitutes, not just a seriously

enforced national interest, but almost an element of that nation's

national identity. Article 47 of the Swiss Banking Act, enacted 80

years ago, provides, in relevant part:

Whoever intentionally discloses secret information
confided to him in his capacity as officer, employee,
agent, or liquidator of a bank, as officer or employee

15

of an auditing firm, or if he has acquired knowledge
in such a capacity, attempts to induce another person
to violate the professional secrecy shall be punished
with imprisonment up to three years or monetary
penalty. If the act has been committed by negligence,
then the penalty shall be a fine of up to 250,000
Swiss Francs. In case of a repetition of such act
within five years following the final sentence, the
fine shall be a minimum of 45 daily income units. The
breach of professional secrecy remains punishable
after termination of the public or private employment
relationship or practice of the profession.

In addition to the sweeping and mandatory language that is
directly on point to a contemplated order to compel disclosure of
customer information held by a bank, a violation of Article 47 is
prosecuted ex officio even if the injured party does not complain,
which shows that this policy is not merely protective of private
interests but expressive of a public interest. And that interest is
definitely enforced. The Swiss Federal Office for Statistics
reports 28 prosecutions between 1987 and 1996, and although that
number has not been recently updated, anecdotal evidence presented
to the Court indicates ongoing, vigorous, and serious enforcement,
as in a three-year prison sentence in 2013 for a former employee of
Bank Julius Baer who aided German tax collectors. Although some
outsiders have suggested that the strong Swiss policy against
disclosure simply reflects an effort to help the Swiss banking
industry prosper by providing a protected haven for tax evaders,

16

Switzerland's recent cooperation with U.S. authorities in pursuing such tax evasion suggests that, on the contrary, Switzerland regards bank secrecy as a positive social value and benefit, to be used but not abused.[3] In such circumstances, a balancing of interests strongly favors denying the release of the subpoenaed information from bank branches located in Switzerland, and the other Aerospatiale factors do not overcome this conclusion. Accordingly, the Court quashes the subpoenas to the extent they seek documents located in Switzerland.

Jordan and the UAE. When the Court issued its August 12, 2013 Memorandum Order finding that the international comity analysis weighed against ordering Standard Chartered to comply with Motorola's subpoena so far as documents located in Jordan and the UAE were concerned, it did so on the basis of Standard Chartered's experts' opinions on Jordanian and UAE law, but without the benefit of any Motorola experts. In its motion for reconsideration, however, Motorola has submitted expert declarations to rebut those

---

[3] Although the Court finds Article 47 of the Swiss Banking Act worthy of substantial deference, the Court rejects the banks' argument that similar deference is due to Article 271 of the Swiss Penal Code, which speaks only tangentially to the production of documents and, according to the Swiss Federal Department of Justice and Police, does not create criminal liability for a bank that adheres to a U.S. court's order to search for bank account documents located in Swiss bank branches.

of Standard Chartered. Upon review, the Court concludes that, even
though the Court previously found that "Standard Chartered has
sufficiently demonstrated a meaningful risk that that it would face
substantial criminal, civil, and regulatory penalties if compelled
to produce the relevant documents," 293 F.R.D. at 600, that
conclusion must now be modified, if not abandoned. For one thing,
the Court has now been apprised that Article 72 of the Jordanian
Banking Law permits disclosure of bank account information if so-
ordered by a "competent judicial authority," and there is no
material indication that this is limited to the courts of Jordan.
See NML Capital, 2013 WL 491522, at *4-*9 (ordering compliance
because objecting party failed to adduce evidence showing that
similar exceptions of various foreign sovereigns would apply only
to domestic courts and not to U.S. courts). More importantly, the
Court's attention has now been focused on the total paucity of
published prosecutions of banks or their officers in Jordan and the
UAE for complying with discovery ordered by a foreign court. Nor
have the objecting banks identified any such prosecutions,
published or otherwise. Accordingly, the Court reverses its prior
order and orders compliance by Standard Chartered with requests for
bank information located in Jordan and the UAE. The same applies to

other banks who have objected to such production from those
countries.

Based on the foregoing, the parties, jointly or severally, are
hereby directed to submit to the Court by January 9, 2015, proposed
orders resolving the pending motions to the extent determined by
the foregoing findings and conclusions. In addition, each bank
whose objections to production are not resolved by such orders
should file with the Court by January 30, 2015, written briefs (not
to exceed ten double-spaced pages) and, if necessary, accompanying
affidavits, suggesting how the foregoing principles should be
applied to documents located in countries other than France,
Switzerland, Jordan, or the UAE that have blocking statutes on
which the objecting banks have relied. Motorola may then respond by
filing a single brief of no more than 30 double-spaced pages, plus
accompanying affidavits if necessary, by February 21, 2015.

        SO ORDERED.


Dated:     New York, New York
           December 22, 2014          JED S. RAKOFF, U.S.D.J.


                                19